May it please the Court, I'm Jason Torchinsky of Holtzman Vogel Josephiak Torchinsky on behalf of the appellants. I'd like to reserve about four minutes of rebuttal time if I may. The Voters Choice Act is discriminatory on its face. It determines your ability to access the franchise based on where you live. That is facially unconstitutional under Reynolds v. Sims and a host of other Supreme Court precedents. Counsel, the problem I have with your argument is that as I understand current California law without regard to the VCA, every voter in this state is permitted to vote by mail, are they not? They are, but they have to take an affirmative step in order to be able to do so. It's a very easy thing to do. You can do it by sending a letter, picking up a telephone, going on the internet, walking into the office of the Registrar of Voters, and being placed on a permanent mail ballot list. How does the VCA unfairly burden voters in counties that are not yet participating in the VCA? Because the VCA is the legislature putting its thumb on the scale and determining which counties the voters are going to have easier. Now granted, I understand access to a ballot in California is easy, but in these particular jurisdictions, we're going to make it that much easier, says the legislature. But doesn't the Supreme Court say that we balance under Burdick the state's interest in trying to encourage greater voter turnout with whatever the burden is, which I think is a very slight burden on the voters who live in counties that do not yet participate? Your Honor, I want to point to something that the appellees said in their opposition brief. They said the state chose 14 counties that were authorized under the VCA, seven of which wound up voting for Donald Trump in 2016, and seven of which wound up voting for Hillary Clinton in 2016. But when you look a little further into that, the seven counties that have voted for Hillary Clinton have seven and a half million people, and the seven counties that voted for Donald Trump have half a million people. So the state has chosen which counties are going to have easier access, people that are going to, excuse me, chose in which counties people are going to have easier access to the franchise. I understand access to the franchise in California is relatively easy, but again, it requires an affirmative step to get on that permanent mail ballot. Is your argument that this is similar to an impermissible motive, such as race or whether or not you have to pay a poll tax or whether or not you own property before you're allowed to vote? It is. Does it rise to that level of constitutional concern? It rises to the level of concern identified by the Sixth Circuit in Obama for America v. Husted, where the court said you can't treat different groups of voters differently based on some characteristics. But in that case, they took away the ability – they made voting harder for people. Except that they allowed it for the military. So they said – Well, originally it was – they allowed everyone to have three days before, if I remember the facts of that case correctly, and they took it away from – and only let the military do it, correct? Right. So in other words – So in this case, no one's life has been made harder in this case to vote, is it? Except that when you look at – and I think the district court put it well – it's almost like you've taken soup and you're diluting it, but the state is choosing where the vote is being diluted. But how is the vote being – And that's the problem. I guess I'm back to where Judge Tallman is in this case. I mean, I'm just trying to understand – okay, just – I'll throw a hypothetical your way. So let's say the state of California said, we want to introduce a new voting technology. We think it's going to be easier for voters to use. It will have bigger letters. And the ballot can be tough to read. It's very small. But we want to test it. We want to test it in some counties in California. And we're going to pick eight counties to test it in. But not all of them, because as we know, it's too expensive to test it in all of them, and we want to do a pilot program. Can they do that in your view? Your Honor, I think there's a difference between which kind of machine I'm using in a particular county, where, again, you actually have to go to a polling place to vote. Or just some technology that makes voting easier. And, Your Honor, look, there are counties that use electronic poll books. There are counties that use paper poll books. I mean, so we're not arguing about the polling place technology. We're actually saying that the state can't pick and choose where every voter gets a mail ballot without having to take any affirmative step versus where you can – But getting back to my question, can a state have a pilot program to try out a new voting technique in one county, or does it have to do it in every single county in the state? I think when it changes access to the ballot, when it actually changes access to the franchise on a discriminatory basis, they can't do it that way. Okay, but you're throwing the word discriminatory in there. Wait a second. I'm just asking. A pilot program, they pull a number out of a hat, and it says Tuolumne. Okay, Tuolumne, you're the lucky guys. You get to have the pilot program. Do we have an equal protection violation? I think it depends what the pilot program is. Well, again, the pilot program is simply to make it easier to vote. And we all agree it's easier to vote in Tuolumne County if the technology works, which is why we're going to test it. Can California do that? I think it depends on what the technology is and how it's being applied. But why would that – why would it matter – again, if it's easier to vote in Tuolumne County than it is in Stanislaus County, under your theory, isn't that a violation of the equal protection clause? No, Your Honor. I'm not saying that if one county uses optical scanners and one county uses touchscreen voting machines that there's an equal protection problem. That's not what we're saying here. In that case, everybody is going to the polling place and accessing – you know, they're going to the polling place. They may be signing in using paper books or electronic books or voting on, again, an optical scanner versus a DRE. That's not what's happening here. What's happening here is California is saying you favored voters in our favored jurisdictions. You're going to get to vote by mail no matter what. You're going to get the ballot deposited right to you. At bottom, you seem to be making a type of dilution argument which suggests that one person's vote is not worth as much as another person's vote. How is it in this scheme that the votes of your clients are somehow worth less than the votes of the voters in the counties that are using this new system? I'm struggling to understand how there's any dilution at all for your clients. Because what the state said at the time they passed the bill was we know or we believe, based on the experience of Colorado, Washington, and Oregon, when you go to vote by mail, it increases overall turnout. And so what they're saying is we're going to choose particular counties where we want to see turnout increase. And here's the dilution problem. We're talking about jurisdictions in California in terms of which candidates are representing that are multi-county jurisdictions. For example, governor, senator, the other statewide offices like attorney general, people in Los Angeles vote, in Los Angeles County vote for those folks, as do people in Nevada County and Placer County and Yuba County and Sacramento County. But the state is saying, hey, guess what? If you live in Sacramento County, we're going to make it that much easier for your county to cast their ballots. But is it really that much easier? I get back to the question I asked at the beginning about current capability for mail-in voting. Your Honor, I — It really is just a matter of asking to be placed on a permanent mail vote list. But the state made a determination in 2016 when they passed this that they didn't believe that voter participation overall was high enough. That's why they needed to make it that much easier. But we know that to be true, do we not? We know that voter turnout rates are very low in large parts of California. But, Your Honor, I guess I get back — Apart from historical records, don't we? I guess I get back to your point. If it's so easy to vote in California, why is voter turnout so low? What the state is saying is, look, if we look at our neighboring states in Colorado and Oregon and Washington, we know that when you go to vote by mail, generally, turnout slash voter participation is increased. So the answer is, I think, that — It's a good thing, don't you think? It is a good thing. But I think that the answer is that the permanent vote by mail option that you've suggested is not as easy as it might be, right? Otherwise, the state wouldn't need to say, we're going to mail to everybody. But it shows up unsolicited in your mailbox. You don't have to affirmatively request that your name be placed on the list. That's right. But making that affirmative request is incredibly easy. I could do it from here if I were a registered voter in California by simply getting on the Internet. So is going to your polling place on Election Day. Let me get back to the question I asked and you didn't answer. Do we apply the Supreme Court's test in Anderson-Burdick to resolve the legal question? Well, Your Honor, Anderson-Burdick was a scale where the court needs to decide — It's a scale in which we balance the interest of the state against the impact on the voter. That's right. And when you have a statute that is — Is that the test we apply? I just need a yes or no answer. No, because the statute is not facially neutral. So what test do we apply? So I think you apply strict scrutiny here because on its face, it is treating voters differently based on where they live. If you're in Placer County or Yuba County, you've got to take some affirmative — Placer. Placer, I'm sorry. Placer County or Yuba County, you've got to take an affirmative step different than your neighbors who live in Sacramento County. Affirmative step is ridiculously simple. It is easy, but it is an affirmative step. And if it were so ridiculously simple, then — In such a way that it amounts to an equal or due process — equal protection or due process file. Because it's overweighting the votes of the counties that are permitted to do this. And here's where you get into an even bigger problem. This year, there's 14 counties that have the option. Come 2020, you've got more counties except Los Angeles that have the option. And then you've got Los Angeles County treated differently. So you literally have three different classes of counties. And remember, the counties that can be added in 2020 have to meet a specific list of conditions before they can do it. Hypothetical. Suppose that the Democratic Party acted like Cook County, Illinois. And they really made an effort to get out the vote. And so they chartered buses and went to rest homes and hospitals and contacted the shut-ins and loaded them all on the buses. And brought them down to the polling place to make sure that they cast their ballot. Would that be unfair dilution as compared to voters in other areas where there was not such an effort to get out the vote? The difference is it's not the government putting its thumb on the scale. In this case, it is the government putting its thumb on the scale because the supermajority Democrats in the legislature decided which counties got to be — got to have this special treatment. But to work with the hypothetical. So the mayor of San Francisco says, look, everybody, I'm going to spend the entire day on the radio. I'm going to knock on every door I can to get out the vote for the Democratic Party. And the mayor of Modesto says, eh, I'm not going to do that. We're not going to use city time to do that. We've got this canal problem out here we've got to deal with. So Modesto doesn't do it, but San Francisco does. Government officials, one promoting the vote, one not. Equal protection problem? No, because it doesn't affect the individual voters' access to the franchise. All that is is government officials publicly encouraging people to, let's say, sign up on the permanent absentee list. I don't think there's a problem if a bunch of different mayors and only some mayors say, please go sign up on the permanent absentee list. I do think it's a problem when the legislature comes out and says, in these favored counties, we are going to essentially do vote by mail for everybody. But in these other counties, we're not. And not only that, not only do you not have the option, you can't do it. Mr. Truchynski, is there anything in the legislative history or in the record of this bill that tells us how the 14 counties were selected? I don't believe that there is, Your Honor. I think it's a list, and I know that the appellees said in their brief that, you know, seven of them wound up voting for Hillary Clinton, seven of them wound up voting for Donald Trump. The way you're making your argument suggests that there was some ulterior motive at work here. This was not simply an experiment to try to improve the rate of voting. Your argument suggests that the legislative record does reveal some kind of political motive favoring counties that might vote a certain way as opposed to others. That seems to be what you're saying. The legislature didn't have the November 2016 election results before them when they adopted this legislation in 2016. So you can only look sort of prospectively at this. But the net effect of it is that, you know, there's 14 times more people in the counties that voted for Hillary Clinton than had voted for Donald Trump that have the option of doing all vote by mail. And I think that the better answer is if the legislature wants to move the state to all vote by mail, they should do it all at once statewide, not in a discriminatory way where they pick and choose different groups of counties and phase it in over time because it changes the way it votes when you're voting in multi-jurisdictional elections. I mean, isn't the state allowed to make changes incrementally to experiment in order to determine whether or not this is actually an effective tool to increase voter turnout? I think incremental change is okay when it's not done in a discriminatory way. And I think in this case where you facially say if you live in these 14 jurisdictions, you're favored versus not these other 40-some-odd jurisdictions. If you're going to do a pilot program, you're not going to necessarily start with some of the biggest counties. You might start with small. You might go to, you know, Elko County and say we're going to try it here before we unleash it on Los Angeles. What's wrong with that? I mean, I'll tell you the way Oregon did it. Oregon did it by allowing vote by mail. What's wrong with the question I just asked? Because the problem is that – well, I guess it depends on what election – what level of election you're talking about. Okay, statewide. Statewide, I think it's a problem because you're weighting the access to the ballot differently and you're voting in the same election. So you're saying, again, so to get back to Judge Tolman's question, a state cannot experiment in a statewide election. It's all or nothing. No, I'm not saying they can't experiment. I'm saying they need to – if they're going to experiment, they need to experiment in a way that's careful. For example, what Oregon did when they began the process towards vote by mail, the legislature allowed jurisdictions to choose to do all vote by mail in their local elections where you didn't have this multi-county thing. So you didn't have people all voting for – you had people all voting for mayor in a town that decides they were going to mail ballots to everybody. In this case, you've got this weird some jurisdictions doing it, some jurisdictions not, when everybody's voting for the same candidates. And that's why you get to the – I think it depends what the pilot program is doing in this case. Well, we've given you a couple of examples. Right, where you're significantly changing access to the actual ballots in a significant way. That's where I quarrel with you. A significant change. Is it really where current law permits every registered voter in the state of California to vote by mail if that's the way they want to do it? I think the legislature believed it was a significant change or they wouldn't have done it. If access to the ballot was so easy and it wasn't access that was affecting turnout. There's a significant financial incentive to the counties, is there, not to be able to get rid of all these antiquated voting machines and not have to – I don't know if they have to lease polling places or not, but they certainly have to hire poll workers to man them. The record shows lots of examples of the cost of conducting an election which will be eliminated if this system is rolled out. Well, there are costs involved in running elections. That is true, Your Honor. Huge costs. And for a small county like Sierra County, that's not an insignificant issue, is it? No, but cost was not the motivation for the legislation. And, Your Honor, I'd like to reserve my rebuttal time if I may. Thank you. Good morning and may it please the Court. Deputy Attorney General Benjamin Glickman on behalf of respondents. If I could, I'd like to start with the district court's decision in this case, which focused on the third and fourth winter factors. And that is reviewed by this court for an abuse of discretion. There's no dispute in this case that the district court applied the correct legal standard. It applied the winter factors. And under this court's precedent, it must be affirmed unless its decision was illogical, implausible, or not supported by the record. Here, plaintiffs point to nothing in the record to call into question the district court's determination. The defendants submitted sworn declarations establishing the risk of disenfranchisement if an injunction were to issue for two reasons. The logistical infeasibility of switching election models at this stage and the concern about voter confusion after having educated voters on a new model or the potential for switching models twice in six months. In response to that, as the district court noted repeatedly, plaintiffs submitted nothing. It's hardly an abuse of discretion for the district court to conclude that some evidence outweighs none. For that reason alone, the district court should be affirmed. Now, turning to the merits, which the court seems very interested in, number one, Anderson verdict does govern this analysis. Anderson verdict governs every analysis for determining the constitutionality of voting regulations. Anderson verdict is an overarching framework. It's not itself a standard of review. It's a framework to determine a standard of review. You look at the burden on the voters. If it's severe, strict scrutiny applies. If it's something less than severe, a lesser level of scrutiny applies. Was Judge Nunley wrong when he characterized the arguments raised by the plaintiffs as serious concerns under the equal protection clause? Yes. Judge Nunley's decision, of course, did not specify a standard of review. It did not even mention the Anderson verdict line of cases. He just assumed for the sake of argument that they had met those first two factors. But, yes, it is the state's position that even assuming that there were serious concerns was incorrect. And it's for the reasons Judge Tolman noted. The burden, if any, on plaintiffs in this case is minimal at worst. And we would venture that it's not actually a burden at all. The VCA doesn't affect their ability to vote in any way. They can vote the same way they could in 2016 and 2014 and 2012. It doesn't alter their ability to cast a ballot in any sense of the term. Counsel noted that Anderson verdict doesn't apply or only applies where the law is facially neutral. And that's simply incorrect. And the Obama for America v. Husted case that they placed so much emphasis on is an example of that. There, there was a law that distinguished between military and non-military voters. Under their terminology, it was discriminatory on its face. And yet the Sixth Circuit there applied Anderson verdict, weighed the severe burden and the state's interest in determining the constitutionality of that law. And I note not only is Obama for America distinguishable for the reason Judge Owens noted that there it was restricting the access to the right to vote. But it was also distinguishable because there was actually evidence in the record in that case. Significant evidence in the record. Expert testimony that hundreds of thousands of primarily African American and lower income voters would not be able to vote if they were not granted this ability to vote early. Here, there is no evidence whatsoever that plaintiffs will be unable to vote in the June election, the November election, or any election. And that alone distinguishes Obama for America v. Husted. So how did you guys pick, you guys, how did the legislature settle on these 14 counties? It's a really interesting list out of the 58 in California. So there's nothing in the legislative record that specifies how they were chosen. I have anecdotal information about how they were chosen. As curious as I am, I will not ask the question. Yeah, but what the legislative record does show is it refers to these 14 counties as early adopter counties, which I think supports the court's framing of this as a pilot program. And I think that's further supported by the elements of the law that require reporting. The counties that participate in this program must report to the Secretary of State after every election, and then the Secretary of State must report to the legislature. And that is indicative that the legislature wanted to make sure that these programs were actually effective. And as the court has noted, there is nothing in the Constitution that requires a state legislature to address all evils at once or to remedy everything at the same time. They are permitted, even in the election context, to proceed incrementally. And this goes back to the 1960s with the McDonald case out of the U.S. Supreme Court, a case which was cited, I believe, by Justice Scalia in one of the concurrences to Bush v. Gore. This is not a dispute that the states are prohibited from pilot programs in the election context. They simply aren't. Turning now to the allegation of partisan motivation. Number one, there is no allegation in this case of partisan motivation. That's not a part of the complaint in this case. It was not briefed in this case. So it's just not part of this case. Even if it were, there's certainly no evidence of partisan motivation. The notation of who the 14 counties voted for was just simply to show that it happened by happenstance to be 7-7 for Senator Clinton and for President Trump. But, again, as counsel noted, they didn't have that information at the time the VCA was enacted. So it was anecdotal, not evidentiary. And I take it we're too soon after the June primary to know whether or not there was a significant increase in voter turnout. That's correct. As of the report that was published by the Secretary of State last night, there's about 2.6 million ballots that have yet to be counted statewide. And so until those ballots are counted, it's impossible to know what turnout statewide or in any of these counties will actually end up being. And am I correct, aren't there currently all-male voting elections permitted in counties in California for, like, school boards or special, replacing somebody who dies or resigns from office? That's correct, for special elections or district elections. In addition, in counties where there is no precinct with more than, I think, 500 voters, perhaps 250, they don't have to do a polling place for such a small number of voters. So, for example, Sierra County, that was mentioned, for several elections now they've conducted all-male ballots. There have been prior legislation that had permitted the county of San Mateo and San Diego County to experiment with all-male ballots in special elections in those counties. So, again, this is not a new phenomenon. And one thing that the appellants emphasize is that every other state to adopt a similar system did it wholesale. And that's true in that they did not say 14 counties can go and 44 can't right now, but it's simply not true that it was implemented in one fell swoop. And we briefed this at the district court. Washington, it took six or eight years before it was a universal adoption. Likewise in Oregon. So, you know, the concerns raised by plaintiffs in this case would have been the same in those cases because some counties were doing it and some were not. And that actually brings me to the larger problem with plaintiff's argument in this case. And that is that they focus on voter dilution. But there simply is no dilution in this case. Taking, for example, statewide elections. Statewide elections, all votes cast in the state, regardless of the county in which they were cast, are totaled up, and whoever gets the most votes wins. It doesn't matter what county those votes came from. It doesn't matter if one county had 100% turnout or another county had 0% turnout. All that matters is who gets the most votes statewide, irrespective of where those ballots were cast from. And the same is true for multi-county legislative districts. And I think the best case to see the distinction and why this case does not present a one-person, one-voter voter dilution concern is Gravy-Sanders. And that's a case that the plaintiffs have relied on and the district court cited. In that case, Georgia did not allocate individual votes to candidates at all. Instead, what it did is it allocated county unit votes to individual counties. And whichever county got the – or whichever candidate in a particular county got the most votes, all of the county unit votes for that county were allocated to that candidate. And the problem there was that the county unit votes were not allocated in proportion to population. So rural counties had an inordinate power to affect the outcome of election vis-a-vis more largely populated counties. It was similar to the Electoral College and how it operated. Here, of course, there is no system like that. For a three-county legislative district, it doesn't matter if all of the votes came from one of the three counties. All that matters is which candidate got the most votes district-wide. And then finally, just to wrap up, throughout this case, plaintiffs have misrepresented how this law operates vis-a-vis Los Angeles. And so I just want to make a couple quick points. Number one, Los Angeles is not in this case. Los Angeles is not eligible to do anything different in their elections under the Voter's Choice Act until 2020. So there's no immediate concern there. But more to that, Los Angeles is not required to do anything, ever. They can continue, like every other county in the state, to do their current polling place model and move forward like that. The only difference for Los Angeles is that beginning in 2020, they will have three options. They can continue doing what they're doing now. They can adopt the all-mail ballot elections that 14 counties had the option to do this election. Or they have a third option, which is somewhat of a hybrid. It's what the legislation calls a vote center election. And the difference there is that mail ballots are not mailed to every registered voter. Rather, they're mailed only to the permanent vote-by-mail ballot or, excuse me, vote-by-mail voters, and to voters in jurisdictions under 500 persons or precincts under 500 persons. So it's kind of a halfway step where some people will automatically get a mail ballot, but not everybody will get a mail ballot. And so under plaintiff's theory, if their theory is that the legislature is putting the thumb on the scale and they're trying to boost turnout in Los Angeles, that hybrid option runs counter to that argument because it is not mailing a ballot to every voter in Los Angeles County. And unless there are any other questions, I will submit on that. I don't. Thank you, Your Honor. Thank you, Your Honor. I would like to make a couple of points in rebuttal. First, with respect to the third and fourth winter factors, where we believe the court, the lower court, went wrong is that here you've got a statute that on its face treats voters differently when they live in different counties. And as a result, what the court was trying to balance was a nonexistent governmental interest in, you know, in treating people differently versus treating people in accordance with the Constitution. So just like this court did in Sanders, which was the Montana judicial endorsement case, if the law is unconstitutional, the weighting of the governmental interest becomes a balance that we think the district court got wrong. So because this statute is discriminatory on its face, the lower court got it wrong because- That assumes that strict scrutiny applies, right? Yes, Your Honor. Okay. And suppose we disagree with that premise. Then don't we apply the Anderson verdict factors and weigh the competing interests? Well, then you're saying- I mean, the district court assumed that strict scrutiny applied. So we don't really know where the district court came out on that. Well, the district court said, I guess I'll assume that it raises serious concerns, but now I'm going to move to what the true public interest is here. And the public interest is encouraging greater voter participation. And I need to examine the impact on the non-VCA voters. Well, Your Honor, I'd like to point you to what the Supreme Court said in California Democratic Party v. Jones and what this court said in ACLU v. Lomax. The state interest in sort of ensuring support or increased turnout is not a compelling governmental interest. It may be something the government can do, but it doesn't rise to the level of a compelling interest where treating everybody the same based on where they live is a compelling governmental interest. I'm trying to understand how you get to strict scrutiny given your opponent's argument that the vote of a resident of a county that uses the old system and the vote of a resident of a county that uses the new system, those votes count exactly the same. There is no consequence that flows from the different residency of those two voters. None. So how do you get to strict scrutiny? Because it's a differential access to the franchise. It's just like in Bush v. Gore where they said you can't count votes differently. You're changing it when voters are voting in the same election. In this case, you're changing the ability to access the ballot. And that's why this is so significant. They're not just saying vote on DREs versus punch cards or optical scanners. But the differential access is I get the ballot automatically mailed to my house as opposed to I get the ballot mailed to my house if I have registered and made a request for it. And I can't go to a polling place. There's no polling places in these all-male counties either. So what? So you don't have the option to go vote. You can drop it off. You can drop it off in a drop box. You can drop it off at the county registrar. You can put it in the mail. I mean, it's a pretty easy system. Voting by mail is an easy system. But, again, what it's doing is it's the legislature said we're trying to increase turnout in these particular counties, and that's where we think. We don't think it's a significant state interest, and I guess that's where you and I part company. It might be an interesting state interest, but the Supreme Court has never found increasing voter turnout to be a compelling state interest to override the equal protection issues that we allege here. So, okay. Thank you, Your Honors. Thank you very much. Argument in this case is now submitted. I want to thank counsel for the argument, and this panel is adjourned.
judges: Lipez, Tallman, Owens